Reed *v.* Conway.

---

REED, Respondent, *vs.* CONWAY, Appellant.

1. Where ministerial officers are required to exercise their judgment, they are not liable for any errors, in the absence of malice. So, a surveyor general is not liable to an action for revoking the commission of a deputy surveyor, annulling a surveying contract, and refusing to receive and examine the field notes, where, without malice and in good faith, he exercises his judgment.

*Appeal from St. Louis Circuit Court.*

This was an action on the case, commenced in 1846, by Warren Reed against Frederick R. Conway, then surveyor general of Illinois and Missouri. The declaration contained four counts.

The first count averred that, on the tenth day of May, 1845, Silas Reed, then surveyor general of Illinois and Missouri, entered into certain articles of agreement, under seal, with the plaintiff, by which it was witnessed and agreed that the plaintiff would, under his own personal and immediate superintendence, and not by sub-contract, execute certain surveying in the state of Missouri, agreeably to the laws of the United States and such instructions as might be given him by said Silas Reed, viz : that he would survey or subdivide into sections, and establish proper corners thereto, townships 65, 66 and 67 north, in ranges 39 and 40 west, and meander the navigable water courses therein, if any, all being north of the base line, and west of the fifth principal meridian ; and that the plaintiff would complete the aforesaid surveys and make return to the office of the surveyor general of his original field notes, together with a fair and correct copy thereof, and a separate plat of each of the townships subdivided, within six months from July 1, 1845 ; and it was further agreed in and by said articles that, on completion of the work, there should be paid to the plaintiff out of the appropriation of March 3, 1845, for the survey of the public lands, direct from the treasury department, as a full compensation, at the rate of three dollars per mile, for every mile and part of a mile which should be actually surveyed and marked, random lines and offsets not included, provided the surveys, field notes, copies of field notes and plats, when returned, should be approved by the surveyor general ; that the said articles, in all their terms and stipulations, were conformable to the laws of the United States and the usages, rules and regulations of the department having charge and superintendence of the public lands ; that before entering into

the performance of said articles, the plaintiff took an oath faithfully and impartially to execute and fulfil the duties of a deputy surveyor, a certificate of which oath was indorsed on said articles, and did also enter into bond to the United States, with good and sufficient security, in the sum of two thousand dollars, for the faithful performance of said articles; that on the 24th of May, 1845, said Silas Reed was removed from said office of surveyor, and the defendant appointed thereto in his place; that the plaintiff performed the work according to the articles of agreement, and on the third of March, 1846, returned to the office of the defendant his original field notes, together with a fair and correct copy thereof, and a separate plat of each of the townships subdivided, and requested the defendant, as surveyor aforesaid, to receive and file in his office said field notes, copies and plats, examine and approve the same, and furnish to the plaintiff a certificate of such examination and approval, as by the duty of his said office, defendant was holden to do; and that the defendant, not regarding the duty of his office, *but maliciously contriving and intending to injure and oppress the plaintiff*, and wrongfully to deprive him of his just rights and dues under and by virtue of the articles aforesaid, *did wilfully, maliciously and unlawfully*, and without any just or reasonable cause, refuse to give a certificate of his approval or examination of said field notes, copies and plats, or any or either of them, or to examine, or in any way inspect the same, or to receive the same into his said office to be filed, or to permit them to be filed therein; by means of which plaintiff had been prevented from receiving any compensation for his labor.

The second count was like the first, except that it did not aver a performance of the work, but in lieu thereof, that the plaintiff set about preparing to complete and fulfil the contract on his part, and therein expended much time and money, and that he was ready and willing, and offered to the defendant, as such surveyor as aforesaid, to complete and fulfil the said contract, according to its true intent and meaning; but the defend-

Reed *v.* Conway.

ant, well knowing the premises, but contriving and maliciously intending to injure and harass .the plaintiff, and to deprive him of all benefit and advantage under his said contract, and to subject him to heavy loss and damage, did, in his capacity as surveyor as aforesaid, *wilfully*, *maliciously* and *unlawfully*, and in manifest violation of the duty of his said office, and without any just and reasonable cause, by his order in writing, declare the said contract to be null and void, and prohibit the plaintiff from fulfilling or attempting to fulfill said contract, according to its true intent and meaning.

The third count charged that the defendant, *contriving* and *maliciously intending* to injure and oppress the plaintiff, &c., in his capacity of surveyor as aforesaid, on the 29th of May, 1845, *wilfully*, *maliciously* and *unlawfully*, and in breach of the duty of his office, and without any just and reasonable cause, by his order in writing, did suspend the operation of said contract for an indefinite time thereafter, and did prohibit the plaintiff from fulfilling said contract and commencing any operations thereunder, and did continue such suspension and prohibition, during all the time mentioned in the contract for the fulfillment of the same, and thereby did hinder, obstruct and prevent the plaintiff from fulfilling the same.

The fourth count was substantially the same as the first, differing in no material respect, except that it avers a suspension of the contract for a space of time by the defendant, whereby plaintiff was prevented from completing it within the time limited by its terms ; but it avers that he then went on and did the work with all practicable diligence and dispatch.

The defendant pleaded " not guilty."

At the trial, the plaintiff read in evidence the following letter of instructions from the commissioner of the general land office to Silas Reed, under which the latter acted in making the contract.   Portions of the letter are omitted :

GENERAL LAND OFFICE, April 15, 1845.

SIR: By the act of congress entitled " An act making appropriations for the civil and diplomatic expenses of the gov-

ernment for the year ending June 30, 1846, and for other pur-
poses," approved March 3, 1846, $1200 were appropriated for
the correction of erroneous and defective surveys in Illinois and
Missouri, at a rate not exceeding six dollars per mile ; and of
the $100,000 appropriated by the same act for surveying the
public lands, in addition to the unexpended balance of former
appropriations, &c., the sum of $14,500 has been apportioned
to your district for surveys, and $1573 for incidental expen-
ses, making a total for these objects of $16,073.

According to the estimate submitted in your last annual re-
port, the first mentioned appropriation will enable you to com-
plete all the erroneous and defective surveys therein referred
to.   The sum of $16,073, apportioned to your district, is
much smaller than the amount asked for, congress having
appropriated only $100,000 for the general purposes of sur-
veying, instead of $135,000 contained in the estimate of this
office for that object; consequently, you will not be able to
have all the work executed which is embraced in your esti-
mate.

You will therefore contract for the survey of such of the
lands only embraced in your estimate, as will best subserve the
public interests, by commanding ready sale, or accommodating
the settlers.   *The surveys on the northern boundary of Mis-*
*souri may be closed upon Sullivan's line, as far west as the*
*surveys have been closed on that line in Iowa.*   *   *   *   *
As these appropriations are for the services of the year ending
June 30, 1846, they will not be applied in payment for work
executed prior to June 30, 1846, without special instructions ;
but as that period will probably arrive before the deputies can
make their arrangements to take the field, you will at once con-
tract for this work, using the most rigid economy which may be
consistent with its correct execution, and under no circumstan-
ces will you pay more than the average price per mile fixed by
law, *or contract for a greater amount of surveying than*
*will be covered by your apportionment;* and that there may
be no risk on this point, you will so estimate the amount of

surveying in each contract that the amount estimated shall not certainly fall short of the actual amount of surveying to be done in it.    *    *    *

Very respectfully, your obed't serv't,

THOMAS H. BLAKE, Com'r.

The plaintiff then read in evidence the contract between Silas Reed, surveyor general, and himself.   It bore date May 10, 1845, and was in its terms as stated in the first count of the declaration.   The signature of Silas Reed was witnessed by Edwin James, sr., and that of Warren Reed by Edwin James, jr.   Upon it was indorsed the plaintiff's oath of office as a deputy surveyor, *dated October* 13, 1845.   The oath was not in the precise form prescribed by instructions from the commissioner of the general land office, dated June 20, 1845.   The bond was also read, bearing date May 10, 1845, signed by Warren Reed, as principal, and Edwin James, sr., as security, the signature of the former being witnessed by Edwin James, jr., and that of the latter by J. T. Sprigg.   By instructions from the general land office, the bond was required to be for double the value of the contract.   The present bond was for $2,000, and it was in evidence that the work contracted for amounted to $1,080.   The contract, affidavit and bond were on the same sheet of paper, and were executed in triplicate, according to the practice of the office—one copy for the general land office, one for the deputy surveyor, and another to be filed in the surveyor general's office.

Silas Reed testified substantially as follows, in regard to the execution of the contract: Plaintiff left St. Louis on the 15th of April, 1845, to execute other surveying contracts in the western part of the state, having received a commission as a deputy surveyor.  The commission, which was read in evidence, was by its terms to be held "during the pleasure of the surveyor general for the time being."   Before leaving, plaintiff signed the present contract in blank.   During his (S. R.'s) term of office, it was a common practice for deputies, before going out to execute contracts, to leave their signatures to other

blank contracts. This practice was adopted in order that the contracts might be sent by mail, and the deputies kept in the field. It was the result of written instructions and verbal suggestions of the commissioner of the general land office. On the 10th of May, he (S. R.) signed the contract, and gave it to his clerk to fill up. At the same time, E. James, sr., signed the bond as security, and was approved as such, and witnessed his (S. R.'s) signature to the contract. Soon after May 10th, and before he (S. R.) knew of his removal from office, he sent off the duplicate and triplicate of the contract to the plaintiff by mail, to have his signature witnsssed in the field. He (S. R.) first knew of his removal May 22d.

It appeared in evidence that Silas Reed, before his removal from office, entered into eleven contracts, bearing date at different times, between the 1st and 13th of May. Among others, was one with George W. Sargeant, one with William Shields, and another with E. James, sr. and E. James, jr., all bearing date May 10th.

Renard, a clerk in the surveyor general's office, and a witness for defendant, testified that he informed S. Reed of his removal from office on the evening of May 21st, and that on the same evening, Reed asked him if he had better give contracts to Sargeant and Shields. Witness advised him to leave it to his successor. Reed, however, said that he would fill up the contracts that night. ˙Next morning, he handed Sargeant's contract to witness to copy. It was dated May 10th. Witness called the attention of Sprigg, another clerk, to the date. He had no reason for suspecting that Reed's contract was antedated, except the fact that Sargeant's was. He was copying clerk. On and after the 22d of May, he received for record nine letters dated May 12th, inclosing contracts. One of these was Silas Reed's letter to Warren Reed. Witness was sick between the 16th and 21st of May, and no letters were recorded between those dates.

After Conway's accession to the office, and on the 29th of May, 1845, he wrote to the plaintiff notifying him not to pro-

ceed under his contract until further advised. At the same time, he wrote to the commissioner of the general land office that he had suspended the eleven contracts entered into by Silas Reed between the 1st and 13th of May, assigning the following reasons for the suspension: 1. No instructions to enter into such contracts were found on file. 2. He doubted the propriety of entering into new contracts before the old ones were completed and approved. 3. He was ignorant of, or doubted the capacity of some of those to whom contracts had been given. 4. The contracts appeared to have been entered into in a hurry, in view of the appointment of a new surveyor general.

On the 10th of June, 1845, the commissioner wrote to Conway, doubting the propriety of suspending contracts, unless for the dishonesty or want of skill of the deputies, or that sufficient security had not been given, but disclaiming any right to interfere in the matter. In June, 1845, Conway removed the suspension from all the contracts except that of plaintiff and the Messrs. James. In July, plaintiff returned the duplicate of the contract by mail to the office of the surveyor general, where it remained until October.

In consequence of the suspension, plaintiff did not proceed under his contract during the summer of 1845. In October of that year, he came to St. Louis. Soon afterwards, Silas Reed called upon Conway and asked him what he intended to do with the suspended contracts of his brother and the Messrs. James. After some conversation, as Silas Reed testified, Conway told him that his brother could go on with his contract, but that the Messrs. James must relinquish some five or six townships of their's, as the work contracted for would overrun the appropriation. On the 13th of October, plaintiff called to get his contract, in order to supply the defects which were pointed out by Sprigg. These were, that the signature of James, as security in the bond, was not witnessed, and the oath was not taken. James came up and acknowledged his signature, and Sprigg witnessed it. Plaintiff then went before a magistrate with the

3—VOL. XX.

contract and took the oath. On the 15th of October, he started on a boat for the field of operations, leaving the contract with his brother to return to the office. Soon afterwards, Silas Reed called to deliver the contract at the office, when he saw a letter written by Conway to the commissioner of the general land office, dated October 13th, in which he stated that he should annul the contracts of plaintiff and the Messrs. James, unless they relinquished six out of the twenty-one townships embraced in them. S. R. did not deliver the contract then, but waited to see what Conway would do. On the 17th of October, Conway wrote to the commissioner that Warren Reed and the Messrs. James had declined to relinquish any part of the work embraced in their contracts, and he therefore considered them null and void. On the same day, he wrote to plaintiff that he had annulled his contract, and should let out the work to other persons. On the 25th of October, Silas Reed sent the contract to Conway to be filed in his office. On the 28th of October, Conway returned the contract to S. Reed by letter, informing him that it had been annulled, and could not be taken notice of. On the 29th of October, Conway wrote to Warren Reed revoking his commission as a deputy surveyor.

To prove performance of the contract, plaintiff read in evidence the deposition of John S. Sheller, who testified that plaintiff surveyed the townships named in his contract, commencing about November 10th, 1845, and finishing about January 19th, 1846; that he assisted in the execution, and that the work was done well, according to instructions, and under the immediate superintendence of Warren Reed. On cross-examination, he stated that plaintiff was not present more than about one third of the time while the work was being executed. During his absence, the field notes were taken by witness in slips on the field. The field notes kept by plaintiff were taken in the same way generally. The field notes taken by witness were generally examined by plaintiff in camp at night. Plaintiff could not, from an examination of the notes taken by witness, have detected any omissions in making corners or

blazing trees. All the plats were made out by witness, in the presence, and under the directions of plaintiff. Plaintiff was in the camp, in the neighborhood of operations, during all the time the work was going on, except a day or two. Witness was a sworn deputy, received from plaintiff twenty-five cents a mile, and in his absence, performed all the work that he would have done if he had been present. After plaintiff had commenced the work, he informed witness that he had received a communication from the surveyor general annulling his contract, and also a notice of the revocation of his commission, but plaintiff continued on and completed his work.

There was evidence that, after the completion of the work, and in March, 1846, the plaintiff tendered his field notes at the office of Conway for examination, and that Conway refused to receive them.

There was evidence to show that a portion of the land included in Warren Reed's contract was north of Sullivan's line.

There was evidence tending to show that the security in the plaintiff's bond was good, and that no objection was made by Conway to his sufficiency, and there was other evidence tending to show that Conway did object to the security.

The following instructions, among a large number of others, were asked by defendant and refused :

9. The defendant is not responsible in this action for the consequences of his decision in suspending the execution of said supposed contract, or in declaring the same null, or in refusing to receive the field notes and plats of plaintiff, tendered as having been made by him in performance of the work mentioned in said contract.

10. If the jury find from the evidence, that the acts of the defendant, charged as grievances in the declaration in this case, were, so far as any such have been proved, official acts, performed by him while he was surveyor general of the public lands of Illinois and Missouri, touching the surveys of public lands within this jurisdiction, and respecting the contracting for

and performing and returning such work by a deputy surveyor, they will find for the defendant.

15. If there can be any recovery at all in this case, it must be on the ground that the defendant acted illegally, to the injury of plaintiff, in the matters specified in the declaration, and also, that he thus acted, with knowledge that his action was illegal. If his conduct, in the points complained of in the declaration, was with the intention of doing his official duty, and with the belief, at the time, that he was doing it, there can be no recovery by the plaintiff.

16. There can be no recovery in this action, unless the plaintiff shall prove, 1st, that defendant acted illegally, to the injury of the plaintiff, in the matters stated in the declaration; 2d, that *defendant also acted maliciously and knowingly wrong in these matters;* 3d, that the plaintiff had performed all requisites prescribed by the rules and regulations of said surveyor general's office to deputy surveyors, and binding on the plaintiff as a deputy, in order to his having the right to proceed to said work; 4th, that the plaintiff performed said work according to the contract, and to the laws, rules and regulations governing such surveys; and 5th, that plaintiff made his returns to the office of the surveyor general, of field notes and plats of said work, in due form and according to said regulations.

A large number of instructions were given for the plaintiff, but none of them made his right of recovery depend upon the *motives* of the defendant.

After a verdict and judgment for the plaintiff, the defendant appealed to this court.

*Geyer & Dayton,* for appellant, among other points, made the following : No action lies in any case for misconduct or delinquency, however gross, in the performance of judicial duties. And although the officer may not in strictness be a judge, still, if his powers are discretionary, to be exerted or withheld, according to his own view of what is necessary and proper,

they are in their nature judicial, and he is exempt from responsibility by action for the motives which influence him, and the manner in which such duties are performed. (*Wilson* v. *Mayor*, &c., 1 Denio, 599. 3 Howard, 87, 97, 98. 3 B. & B. 275.) Officers required by law to exercise their judgment are not answerable for a mistake of law, or mere errors of judgment, without any fraud or malice. (*Jenkins* v. *Walden*, 11 J. R. 114. Ib. 180. 3 Denio, 117, 120, 2 Caines, 312. 4 Howard, 131.)

*R. M. Field*, for respondent. I. The surveying contract proved by the plaintiff below was binding on the United States and all its officers. (*U. S.* v. *Tingey*, 5 Peters, 115. *U. S.* v. *Bradley*, 10 Peters, 343. Opinion of Att'y General Wirt, 1 Opin. Att'y Gen'ls, p. 343. Act March 3, 1831, to create surveyor for Louisiana, sec. 4.) II. The defendant having undertaken to suspend and then to annul the contract, and having violated the rights of the plaintiff under it, by refusing to receive his notes, or to permit him to file them in his office, so as to obtain the benefit of his contract, is liable for all the damage sustained. (Story's Eq. §320 *et seq. Turner* v. *Sterling*, 2 Vent. 26. *Ashby* v. *White*, 2 Ld. Ray. 938. *Lincoln* v. *Hapgood*, 11 Mass. 350. *Freeman* v. *Otis*, 9 Mass. 272. Cowper, 161. 4 Howard, 131. 7 Howard, 130. 12 Howard, 404.)

RYLAND, Judge, delivered the opinion of the court.

From the great number of the questions and the points made in this case, were the court to express its views on each one, would require it to extend the opinion to very great length. I do not think it necessary to notice many of the points made, as there are some plain and general propositions, well settled, which must govern and determine this case.

It will be seen from the facts set forth in the statement of the case, that this was a suit brought by a deputy surveyor against the surveyor general of the United States for Illinois

and Missouri, charging him with wrongfully and maliciously refusing to receive and approve surveys made by such deputy, as set forth in the first count of his declaration. In the second count, for maliciously annulling and avoiding his contract for surveying, after he had commenced fulfilling it. In the third count, for maliciously and indefinitely suspending the contract, whereby he (plaintiff) was prevented from performing the same. In the fourth count, for maliciously suspending the contract for a time, by which he was delayed in the performance of the contract, and for refusing to receive, inspect or approve his work, whereby plaintiff lost the benefit of his labor and of his contract. The defendant pleaded not guilty. From the great mass of evidence, it will be found that Silas Reed was surveyor general of Illinois and Missouri; that he was removed from office in May, 1845; and that Frederick R. Conway, the defendant, was appointed to fill Reed's vacancy. The plaintiff in this action is brother of Silas Reed. The articles of agreement made between Silas Reed and Warren Reed, by which Warren was to survey certain townships of land, being townships 65, 66 and 67, north, ranges 39 and 40 west of the fifth principal meridian, was dated May 10th, 1845. The affidavit indorsed on the agreement, was dated 13th October, 1845, upwards of five months after the date of the agreement. The bond of Warren Reed, with Edwin James, sr., as security, was dated May 10th, 1845. The witness, Sprigg, says he witnessed the bond, as he supposes, about the 13th of October, 1845. He thinks the bond was signed about October 13th. Warren Reed came to the office; witness supposed the difficulties settled; witness handed him his bond for completion, pointed out its defects; these were, the oath was not taken—the signature of Edwin James, sr., as security, was not witnessed—the oath was not indorsed on the contract. Witness says he first saw the contract on July 9th; he thinks it was then returned to the office. Conway took possession of the office about May 24th. Witness says Conway refused to receive this agreement. Silas Reed stated that the contract was signed by his brother in blank

in April, and was signed by him (witness) in May, after being sent to his brother in the field : says the reason he sent it was this : he was admonished by the department to get good deputies and keep them in the field all the time. A witness, Adolph Renard, said he was a clerk in the surveyor general's office in 1845, and had been since 1837 ; was clerk at the time Silas Reed was removed, on the 23d or 24th of May, 1845. Reed's removal was known in St. Louis at noon on the 21st, when the mail came in, by letters ; on the evening of May 21st, at 4 or 5 o'clock, Reed took the witness to his room ; witness told him that Conway was appointed. Reed asked the witness if he could give contracts to Sargeant and Shields ? Witness said he'd better leave it to Conway ; Reed said he would make the contracts that night, and that the witness could come early next morning. Witness said, "I came and copied the contract to Sargeant ; I don't recollect that Reed asked my advice as to his right to make these contracts ; he only asked me if he had bet-better give contracts to Sargeant and Shields ; that to Sargeant I copied next morning ; it was a rough draft in Reed's writing ; don't remember the date. I had one contract for Sargeant, dated May 10th ; Reed said he would fill it up and prepare it at home that night, 21st ; I believe it was filled up in the writing of Dr. James ; I never saw Shield's contract until it came back ; I filled up the instructions only to Sargeant ; the date of the contract, on the 10th, attracted my attention on the 21st, and on the 22d, I showed it to Sprigg. Respecting the other contracts, Reed said no more to me than I have stated ; the letter to Shields and Sargeant, inclosing these contracts, was written on the 16th or 17th of May ; I was sick from the 16th to the 21st, and the letters written were not recorded between these dates. On the 22d, I received them all at my house to record ; the clerk came on the 22d or 23d, with a letter dated May 12th, to Shields, to have put back in its place on the book. I took all that were given to me ; I don't know when that letter to Shields actually was written ; I put the letter to Shields back in its place, as a letter of 12th May ; the in-

struction of the clerk to me was, to put the letter back in the place of its date, so as not to come after other letters of a subsequent date. The letter to Sargeant, I received to record on the 22d or 23d; when I went home sick, I took it home. I had no idea when it was written, except from the conversation of Dr. Reed on the evening of the 21st May; by referring to the letter book, I find that there are nine letters inclosing contracts, dated May 12th; I got none of these letters to record prior to the 22d; the drafts of letters we dated for the records. The surveyor general makes drafts, and from these are made letters to be sent. In this case they had accumulated; I don't know who copied from the draft the letters to be sent off; I was sick myself; I had no means of knowing that the nine letters, except Shields' and Sargeant's, were or were not written at the date they bore. I told all this conversation on the evening of the 21st with Reed, to Conway; I probably told Conway that all was not right, when I saw, on the 21st, the date of the 10th on the contracts of Shields and Sargeant; but it is four years ago, and I do not well recollect. I know nothing of those contracts except to Sargeant and Shields; it was not the practice to fill up contracts out of the office; these two contracts Reed said he would take home and fill up and bring back the next morning; all this I told Conway. I told Conway that, in my opinion, these two contracts were ante-dated; I told James that I would lay this matter before the general land office, and also before Conway; there was no discussion as to the mode of action; I did make a communication to the defendant, I believe; I recollect no contract with Dr. James of May 10th; I did write to the general land office myself about the matter; I don't know when the letters to Shields and Sargeant were sent, but I believe they were sent after they were recorded; I don't recollect when I finished recording them; it was three or four days I suppose; they were all recorded at one time—Warren Reed's letter among the rest; don't know when Warren Reed's letter was sent; I only saw the draft of the letter, and never the letter itself. Witness said he had no reason to suppose War-

ren Reed's contract was ante-dated; says he believes they were all dated right, except Shields' and Sargeant's. Witness says he often heard Conway say that Dr. James was not sufficient security for that contract."

Conway comes into the office of surveyor general on 24th May, 1845. He has been informed of the contracts made by Silas Reed with Shields and Sargeant — these contracts spoken about, and inquiry made by Reed of one of the clerks in the office, on the 21st of May, in regard to the propriety of making them, *evidently* impressing the clerk with the idea that they were not then made; yet on the next morning, 22d May, the clerk finds the contract with Sargeant dated May 10th. That attracts so much his attention, that he calls the attention of Mr. Sprigg, another clerk in the same office, to the transaction; writes to the department at Washington about it, and lays the same before Conway, the new officer; tells him he believes all is not right. Here are other contracts dated 12th May—among these, the contract of the plaintiff, Warren Reed, to which this action owes its origin, Conways' suspicions might well be awakened; the clerk's obviously were.

Let us now turn to the powers and duties of the surveyor general. On the 18th May, 1796, the office of surveyor general was, by act of congress, first created; his duties were to engage a sufficient number of skillful surveyors, as his deputies, whom he shall cause, without delay, to survey and mark the unascertained outlines of the lands lying north-west of the river Ohio, and above the mouth of the river Kentucky, in which the titles of the Indian tribes have been extinguished, and to divide the same in the manner hereinafter directed: he shall have authority to frame regulations and instructions for the government of his deputies; to administer the necessary oaths upon their appointments; and to remove them for negligence or misconduct in office. (1st U. S. S. at large, 464.)

The surveyor general of Illinois and Missouri was created by act of congress of 29th April, 1816, with same general powers

of the surveyor general of the lands north-west of Ohio. (3 U. S. Statutes, 325.)

By these acts, the surveyor general is an executive officer, with ministerial duties, and also with judicial powers in some cases. He must decide as to the qualifications and skill of his deputies : he must decide as to the correctness of the work—the sufficiency of the bond, as regards the security of his deputies ; has power to administer the oath of office to his deputies : he can remove from office for negligence or misconduct ; can, consequently, institute investigations in regard to such matters, and can decide and determine the same ; must often decide according to his own judgment in matters connected with the public interest and welfare, in regard to the surveys of the public lands ; can frame regulations and instructions for the government of his deputies, and, as a matter of course, can require obedience and conformity to such regulations and instructions. See Opinion of Att'y General Wirt below. Opinions U. S. Att'y Gen'ls, 1 vol. p. 433.

" This act imposes upon the surveyor the following duties :

1. To engage a sufficient number of skillful surveyors as his deputies.

2. To cause so much of the land as the president of the United States should direct, &c., to be surveyed, divided in the manner in which the surveyor general had been authorized to do, &c.

3. To do and perform all other acts which the surveyor general was authorized and directed to do, with regard to the lands under his charge.

4. To do and perform all and singular the duties required by law to be performed by the principal deputy surveyor for the territory of Missouri.

5. To fix the compensation of the deputy surveyors, chain-carriers and axe-men : *Provided*, that the whole expense of surveying and marking the lines should not exceed three dollars for every mile that should be run and surveyed.

This act having, by reference, devolved on the surveyor of Illinois and Missouri, the same duties which had, by previous law, been prescribed for the surveyor of the United States and the principal deputy for the territory of Missouri, it becomes necessary to turn to the laws which prescribe these duties.

*The Surveyor General.*—This officer was appointed under the act of the 18th May, 1796, "providing for the sale of lands of the United States in the territory north-west of the Ohio and above the mouth of the Kentucky river." His duties prescribed by law are:

1. To engage a sufficient number of skillful surveyors as his deputies.

2. To cause his deputies, without delay, to survey and mark the unascertained outlines, &c., and to divide the same in the manner therein dictated.

3. To frame regulations and instructions for the government of his deputies.

4. To administer to his deputies the necessary oaths, upon their appointment.

5. To remove those deputies for negligence or misconduct in office.

6. From the field books returned to him by his deputies, to cause a description of the whole lands surveyed to be made out; a fair plat to be made of the townships, and fractional parts of townships, contained in the said lands, describing the sudivisions thereof, and the marks of the corners.

7. To cause the plat so made to be recorded in books to be kept for that purpose, a copy whereof is to be kept open, at the surveyor general's office, for public information, and other copies to be sent to the places of sale, and to the secretary of the treasury.

*The Principal Deputy Surveyor of Missouri.*—The only duty of this officer which it is necessary to notice, on account of the reference made to those duties under the law under which General Rector was appointed, is that which requires this prin-

cipal deputy to execute himself, or cause to be executed by his deputies, such surveys as may be authorized by law.

As the skillful deputies so required by the law to be appointed by the surveyor in chief, are placed under his superintendence; as he is made responsible, in the first instance, for the judiciousness of the selection, and by the power and duty of removing them for negligence or misconduct in office, is made responsible for the manner in which they perform their duties, it becomes necessary to inquire what those duties are. The duties of the deputies, as prescribed by the act of the 18th May, 1796, are:

1. To proceed, without delay, to survey and mark the unascertained out lines, &c., and to divide the same in the manner directed by that act: that is, the *deputies themselves* are to do this work, and the surveyor general is expressly required to cause them to do it.

2. To cause to be marked on a tree, near each corner, within the section, the number of such section, and over it, the number of the township within which such section may be.

3. *The deputies shall carefully note, in their respective field books, the names of the corner trees marked, and the number so made.*

4. To divide the fractional parts of townships into sections, in the manner required by law, and to annex the fractions of sections to the adjacent entire sections.

5. To mark all the lines plainly upon trees, and to measure those lines with chains containing two perches of sixteen and a half feet each, subdivided into twenty-five equal links; which chain shall be adjusted to a standard to be kept for that purpose.

6. *Each deputy surveyor is ordered to note in his field book the true situation of all mines, salt licks, salt springs, and mill seats which shall come to his knowledge; and to note, also, in his field book, all water courses over which the lines run by him shall pass,* and *also the quality of the land.*

7. To return the field books so made out to the surveyor general, who shall therefrom cause a description of the whole lands surveyed to be made out and transmitted to the officers who may superintend the sales.

It is manifest, from this view of the laws, that the national legislature has confided the very important business of surveying the public lands to *deputy surveyors only ;* with regard to whom it has prescribed the following guards :

1. That they shall be selected by the surveyor general for their skill.

2. That they shall be sworn by the surveyor general to the faithful performance of their duty.

3. That they shall act under regulations and instructions framed for their government by the surveyor general.

4. That they shall be removable, at the pleasure of the surveyor general, for negligence or misconduct in office.

It may not be amiss to notice, also, a species of lateral check which the law has placed on the work thus to be done by the deputies ; it arises from the duty imposed on the surveyor to cause to be deduced from the field books returned by his deputies a fair plat of all the townships and fractional parts of townships contained in the land described in those field books— a process calculated to detect any inaccuracy in the work returned by the deputy ; and much better calculated to detect it than if the deputy himself had been required to make the plat, and the surveyor general merely to examine the plat so made ; because the first is a more secure process and less liable to oversight and neglect than the latter.

The act of 29th April, 1816, under which Gen. Rector was appointed, after fixing his salary at a thousand dollars, authorizes him to receive from individuals, "for recording the surveys executed by any of his deputies, at the rate of twenty-five cents for every mile of the boundary line of such survey ;" which is further confirmation, if any were required, that the law contemplates no survey but such as are executed *by the deputies themselves."*

Reed *v.* Conway.

Now an officer of these powers, and with the burden on him of a faithful discharge of these duties—just coming into office, receiving unfavorable impressions from those who had a right to know, and who did know the conduct of his predecessor—seeking for information of such contracts just made, and finding no such agreements, or contracts, nor bonds of such contractors on the files of his office as were required by law and the regulations of the department, might very properly think that all was not right.

The plaintiff bases his right of recovery in this case on two main grounds. 1st, the binding obligation of the surveying contract made between Silas Reed, the surveyor general, and himself, on the United States and all its officers. 2d, the defendant, by suspending the contract and afterwards annulling it, violated the rights of the plaintiff under the contract, by refusing to receive his notes or permit him to file them in his office, so as to obtain the benefit of his contract, and is liable to plaintiff for all damages sustained.

Without undertaking to decide upon the validity of the contract, for it may be a binding contract and yet the defendant not liable in this action, I shall pass to the second proposition, for that I consider the main question in this case. Yet it may not be amiss to give some hints on one important matter in relation to these surveying contracts. The practice of sending out from the office blank agreements to the deputy surveyors in the field, for surveying other lands than those originally contracted for; that is, agreements left blank as to townships, ranges, &c.; blank as to quantity of lands to be surveyed, and these agreements to be filled up and sworn to, as may best suit the deputy, is a practice fraught with so much evil, as to merit the reprobation of the courts of justice of the country.

Let us for a moment contemplate this matter. Here comes to the deputy surveyor in the field a blank agreement for another survey of the public lands; the townships are left blank; the ranges are left blank; it may be filled by inserting any reasonable number of townships, from one to ten or twenty, as the case

may be, and with any range. The surveyor knows the country; he selects his townships and his ranges, so as to fill his blank agreement with lands in that portion of the country most easily surveyed : he may skip one township or range, because it is broken or mountainous, or because it is cut through by a water course, or because it contains lakes, or any other difficulty or obstruction to ordinary field work ; select the part most accessible, and *most* propitious for field work, and throw the most difficult township and ranges upon the hands of less favored deputies. Such may and would be the result, by the surveyor general sending out to the field the blank agreements for public surveys, to be there filled up by such deputies as he might see proper and fit to trust. Let the agreements and bonds and affidavits all be prepared, and properly executed, and then let the work begin.

There can also be no room for doubting that the personal supervision of the deputy is necessary, before he can make the certificate to be attached to the field notes. He cannot employ an assistant, though such assistant be a sworn deputy himself. The regulations require the personal services ; the personal supervision of the deputy himself : he must do the work himself, or at least be present during the operation. " The law does not recognize such officers as the *assistant surveyors* of the deputy surveyors ; for it contemplates the *deputies themselves* as bound to perform *in person* the duties prescribed by law to them." Att'y Gen. Wirt's Opinion. 1 vol. Opin. Att'y Gen. 435.

1. I come now to the main question. Is the surveyor general liable to an action by a deputy surveyor, for annulling his contract, revoking his appointment, refusing to receive and file his work or approve the same, so that he may get his compensation ? This is an important question ; it has been felt as such, and has met with due reflection and consideration.

From a careful examination of authorities from the case of *Turner* v. *Sterling*, 23d Charles II., reported in 2 Ventris, 26, down to our own times, both in the English and American

courts, the doctrine that a ministerial officer, acting in a matter before him with discretionary power, or acting in a matter before him judicially, or as a *quasi* judge, is not responsible to any one receiving an injury from such act, unless the officer act maliciously and wilfully wrong, is most clearly established and maintained.

The case of *Ashby* v. *White*, is relied on by the plaintiff in support of his action. I will notice this hereafter. In the case of *Turner* v. *Sterling*, 2 Vent. 26, the plaintiff charged " that the defendant, not minding the execution of his office, but violating the law and custom of the city, did then and there *maliciously* refuse the numbering of the polls," &c. Three judges here held that the action was maintainable, against the opinion of Chief Justice Vaughn. This was afterwards affirmed in King's Bench. *Ashby* v. *White*, 2 Lord Raymond, 938 : In this case, it was held, that a man who has a right to vote at any election, for members of parliament, may maintain an action against the returning officer, for refusing to admit his vote. The declaration contains an averment, that the act was done *fraudulenter et malitiose*. After verdict for plaintiff, on not guilty pleaded, it was moved in arrest of judgment, that the action was not maintainable, and three of the four judges were in favor of the motion—Chief Justice Holt against it. This judgment was afterwards reversed in the House of Lords. But from one of the resolves in the House of Lords, in this case, it may be seen that they held the matter actionable, by reason of the malicious conduct, as charged, of the defendant. Lord Holt held, that the defendant was not a judge, nor any thing like a judge, but only an officer to execute a precept. Justice Gould considered the defendant a judge ; Justice Powys, a *quasi* judge, and Justice Powell thought the defendant no judge, nor *quasi* judge. This last case, then, may be considered as one not contrary to the general doctrine, that, for a judicial act, within the authority and jurisdiction of a ministerial officer, such officer is, and can be liable to a party injured thereby, only when the act is done wilfully and maliciously wrong. In

Massachusetts, it was held, that an action lay against the select-
men for refusing to receive the vote of a qualified elector, al-
though not chargeable with malice. *Lincoln* v. *Hapgood et al.*
11 Mass. 350. In delivering the opinion in this case, Parker,
Chief Justice, says: " In consequence of an increased inter-
est in elections, it has become a matter of serious consideration
whether the selectmen of towns, acting fairly in discharge of a
duty imposed upon them by law, shall be exposed to actions for
a mere mistake of law, or misapprehension of facts ; whether,
in truth, they are not to be considered as *judge*, and so en-
titled to the common privilege of the judicial character, not to be
punished, or to be responsible in damages, for any consequence
of a judgment merely erroneous. I confess I have, for some
time, maintained the affirmative upon this question, and have,
in one or two instances, at *nisi prius*, given this opinion, re-
serving a right to the plaintiff to have the question decided by
the whole court. But long reflection upon the subject, and the
reasoning of those of my brethren, who have inclined to the
opposite opinion, have finally satisfied me that I was mista-
ken." In this same opinion, the Chief Justice, after mention-
ing the cases of *Ashby* v. *White, Drewe* v. *Coulton, Harman*
v. *Tappenden*, 1 East, 563, says : " It is fair to suppose, that
an action of the case cannot now be maintained in England, for
rejecting a vote, unless the injury is proved to have been done
*maliciously.*" In a note to this very case of *Lincoln* v. *Hap-
good et al.*, the reporter says : " It would seem that the se-
lectmen did not merely act ministerially, but judicially, in re-
fusing the plaintiff's vote ; and, in general, no action can be
supported against any person acting judicially, within the lim-
its of his jurisdiction, for any judicial act, however erroneous
his decision or malicious his motive ;" and cites 5 Mass. 547.
1 N. Hamp. 88. 1 Salk. 306. 2 T. R. 305. 5 T. R. 186.
11 Johns. 114. Ld. Ray, 466. 3 Maule & S. 325. 2 Bay,
169. 4 Bibb, 28. 3 Caines Rep. 170. 17 Johns. 145. This
case, then, from 11 Mass. R., may be considered as not regard-
ing the act of selectmen of towns, in rejecting a vote or refus-

ing to receive a vote, as a *quasi* judicial, but merely as a ministerial act. This case cannot, then, be considered as an authority, where the act is a judicial one.

In the case of *Freeman* v. *Otis*, 9 Mass. Rep. 272, the court said that, "Where a public agent makes a contract in the name and behalf of the government, it is a point well settled, that the agent is not liable to the action of the party contracted with, who must look to the government. But if such agent should deny to the government that he had entered into such contract, and by such interference prevent the party from his remedy, as against the government, he must be personally liable, as he has by his conduct in effect disavowed his acting in the character of a public agent." This case does not contravene the proposition under investigation. It is a well settled principle that, where a man acts as agent for the public, and treats in that capacity, he is not personally liable.

In the case of *Mostyn* v. *Fabrigas*, Cowper's Rep. 161, nothing is found against this general proposition. One of the grounds of defence in that case was, that the defendant, being governor of Minorca, is answerable for no injury whatever done by him in that capacity. To this, it was answered, if the defendant has a justification, he must plead it, and that if the court had not a general jurisdiction of the subject matter, he must plead to the jurisdiction; cannot take advantage of it on general issue. Therefore, by the law of England, if an action be brought against a judge of record, for an act done by him in his judicial capacity, he must plead that he did it as judge of a court of record, and that will be a complete justification. So in this case; if the injury complained of had been done by the defendant, as a judge, though it arose in a foreign country, where the technical distinction of a court of record does not exist, yet sitting as a judge, in a court of justice, subject to a superior review, he would be within the reason of the rule, which the law of England says shall be a justification; but then he must plead it. But the sacredness of the defendant's person, as governor, will not justify him; and if it would, it

must be pleaded. There is nothing in the remark of Lord Mansfield, except biting sarcasm, "that the action, if it did not lie against any other man, it shall, *most emphatically*, lie against the governor."

In the case of *Garland* v. *Davis*, (4 How. Rep. 149,) the opinion of the court was confined to a question on the pleadings, and no opinion on the merits was either formed or given by the court; the majority of the court thinking the pleadings were in such a state as to preclude them from giving any satisfactory opinion on the merits.

In *Wilkes* v. *Dinsman*, 7 How. Rep., January term, 1849, Supreme Court United States, p. 130–131, Justice Woodbury, in delivering the opinion of the court, says : "Hence, while an officer acts within the limits of that discretion, the same law which gives it to him will protect him in the exercise of it ; but for acts beyond his jurisdiction, or attended by circumstances of excessive severity, arising from ill-will, a depraved disposition, or vindictive feeling, he can claim no exemption, and should be allowed none, under color of his office, however elevated or however humble the victim. (2 Carr. & P. 158, note. 4 Taunt. 67.) When not offending, under such circumstances, his justification does not rest on the general ground of vindicating a trespass in private life, and between those not acting officially and not with discretion. Because then, acts of violence being first proved, the person using them must go forward next, and show the moderation or justification of the blows used. (2 Greenl. Ev. §99.) The chief mistake below was, in looking only to such cases as a guide ; for the justification rests here on a rule of law entirely different, though well settled, and is, "that the acts of a public officer, on public matters, within his jurisdiction, and where he has a discretion, are to be presumed legal, till shown by others to be unjustifiable. (*Gidley* v. *Lord Palmerston*, 3 Brod. & Bing. Rep. 275. *Vanderheyden* v. *Young*, 11 Johns. 150. 6 Harr. & Johns. 329. *Martin* v. *Mott*, 12 Wheat. 31.) This, too, is not on the principle merely that innocence and doing right

are to be presumed, till the contrary is shown; (1 Greenl. secs. 35-37;) but that the officer, being trusted with a discretion for public purposes, is not to be punished for the exercise of it, unless it is first proved against him, either that he exercised the power confided, in cases without his jurisdiction, or in a manner not confided to him, as with malice, cruelty, or wilful oppression; or, in the words of Lord Mansfield, in *Wall* v. *McNamara,* that he exercised it as "if the heart is wrong." (2 C. & P. 158, note.) In short, it is not enough to show that he committed an error in judgment, but it must have been a malicious and wilful error. *Harman* v. *Tappenden et al.,* 1 East, 562–565, note. Justice Woodbury then proceeds: "It may not be without some benefit, in a case of so much interest as this, to refer a moment further to one or two particular precedents in England and in this country, and even in this court, in illustration of the soundness of these positions. Thus, in *Drewe* v. *Coulton,* 1 East, 562, note, which was an action against the defendant, who was a public returning officer, for refusing a vote, Wilson, J., says: "This is, in the nature of it, an action for a misbehavior of a public officer in his duty." Now I think that it cannot be called misbehavior, unless maliciously and wilfully done, and that the action will not lie for a mistake in law. By *wilful,* I understand contrary to a man's own conviction. In very few instances is an officer answerable for what he does to the best of his judgment, in cases where he is compellable to act; but the action lies where the officer has an option whether he will act or not." (See these last cases collected in *Seaman* v. *Patten,* 2 Caines, 313–315.)

In a case in this country, (*Jenkins* v. *Waldron,* 11 Johns. Rep. 121,) Spencer, J., says, for the whole court: "It would, in our opinion, be opposed to all the principles of law, justice, and sound policy, to hold that officers called upon to exercise their deliberate judgments, are answerable for a mistake in law, either civilly or criminally, when their motives are pure, and untainted with fraud or malice." Similar views were again expressed by the same court, in same volume, p. 160, in *Van-*

*derheyden'* v. *Young.* And in a like case, the Supreme Court of New Hampshire recognized a like principle. It is true, said the Chief Justice for the court, that moderators may dedecide wrongly with the best intentions, and then the party will be without remedy; and so may a court and jury decide wrongly, and then the party will be without remedy also. But there is no liability in such case, without malice alleged and proved. *Wheeler* v. *Patterson*, 1 N. H. Rep. 90. Finally, in this court, like views were expressed, through Justice Story, in *Martin* v. *Mott*, 12 Wheat. 31, "Whenever a statute gives gives a discretionary power to a person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statutes constitute him the sole and exclusive judge of the existence of those facts. Every public officer is presumed to act in obedience to his duty, until the contrary is shown." In the case of *Dinsman* v. *Wilkes*, (12 How. 404–405,) in 1851, Chief Justice Taney says, when the case was last before the court: "The case, therefore, turns upon the motive which induced Captain Wilkes to inflict the punishments complained of; and this question is one exclusively for the jury, to be decided by them upon the whole testimony. And the rule of law by which they must be governed in making up their verdict, is contained in a single proposition. It is this: If they believe, from the whole testimony, that the defendant, in all the acts complained of, was actuated alone by an upright intention to maintain the discipline of his command, and the interest of the service in which he was engaged, then the plaintiff is not entitled to recover. But if they find that the punishment of the plaintiff was in any manner or any degree increased or aggravated by malice or a vindictive feeling towards him, on the part of Captain Wilkes, or by a disposition to oppress him, then the plaintiff is entitled to recover." In *Kendall* v. *Stokes*, 3 Howard, 97, Chief Justice Taney, in delivering the opinion of the court, says: "We are not aware of any case in England or in this country, in which it has been held that a public officer, acting to the best

of his judgment, and from a sense of duty, in a matter of account with an individual, has been held liable to an action for an error of judgment. But a public officer is not liable to an action, if he falls into error in a case, where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion — even although an individual may suffer by his mistake. A contrary principle would, indeed, be pregnant with the greatest mischief. It is not necessary, we think, to refer to the many cases by which this doctrine is established. It was fully recognized in the case of *Gidley* v. *Lord Palmerston*, 3 B. & B. 275." In this case against Lord Palmerston, it was held that an action of assumpsit could not be maintained against the secretary at war by a retired clerk of the war office, for his retired allowance, although such allowance was included in the yearly estimates drawn for by such secretary, and received by him as applicable to such specific allowance, on the grounds that the secretary is only chargeable in his public and official character, and that an action cannot be maintained against him, as such, for any thing done by him in that character, although it may amount to a breach of employment, and constitute a particular and personal liability, as it would tend to expose him to an infinite number of actions, to be brought by any persons who might suppose themselves aggrieved. In *Rice* v. *Chute*, Lord Kenyon said : " That he could not conceive how the captain of a troop could be personally responsible for forage furnished the troops, whether he had received any money for that purpose or not." See note to *Freeman* v. *Otis*, 9 Mass. 264.

In the case of *Kendall* v. *Stokes*, Chief Justice Taney, speaking of the case of *Ferguson et al.* v. *Earl of Kinnowl, et al.*, 9 Clark & Finnelly, 251, which case was relied on by the counsel for the defendant in error, says : " This case is in no respect in conflict with the principles above stated : nor with the rule laid down in the case of *Gidley* v. *Lord Palmerston*." In the case from *Clark & Finnelly*, the point decided was, not only that the act was ministerial, but because

Reed *v.* Conway.

it had been decided to be such by the highest judicial tribunal known to the laws of Great Britain. The refusal for which the suit was brought took place after the decision, and the learned Lords by whom the case was decided, held that the act of refusal, under such circumstances, was to be regarded as wilful and with knowledge ; that the refusal to obey the lawful decree of a court of justice, was a wrong for which the the party who had sustained injury by it might maintain an action, and recover damages against the wrong doer.

In *Weaver* v. *Devendorf*, 3 Denio; 120, it was held, that a public officer is not responsible in a civil suit, for a judicial determination, in a matter over which he had jurisdiction, however erroneous or however malicious the motive which produced it. Weaver sued Devendorf and two others before a justice of the peace, and declared against them in case, for that, being assessors of the town of Frankfort for the year 1843, they assessed the plaintiff's taxable property at $1800, and in so doing, refused to allow him the benefit of the exemption to which he was entitled as a minister of the gospel ; that they estimated his property at a higher rate than that of other taxable inhabitants of the town, and refused to make a deduction from his personal property, for debts owing by him, though he proved to their satisfaction that he owed such debts, by means of which he was taxed and obliged to pay a large sum, &c. In some of the counts, the defendant's conduct was charged to have been *wilful* and *corrupt*, and in others, careless and negligent. The defendants pleaded the general issue. The justice, after trial before him, rendered judgment for the plaintiff, which the Common Pleas reversed. The plaintiff brought error to the Supreme Court. Beardsley, J., delivered the opinion. The judge said, " the case might be disposed of on narrow grounds, for there was no evidence to justify the conclusion that the defendants acted maliciously in fixing the value of the property of the plaintiff or of any one else ; and surely it will not be pretended they were liable for a mere error of judgment. But I prefer to place the decision on the broad

ground, that no public officer is responsible in a civil suit, for a judicial determination, however erroneous it may be, and however malicious the motive which produced it. Such acts, when corrupt, may be punished criminally, but the law will not allow malice and corruption to be charged in a civil suit against such an officer, for what he does in the performance of a judicial duty. The rule extends to judges, from the highest to the lowest; to jurors, and to all public officers, whatever name they bear, in the exercise of judicial power. It, of course, applies only where the judge or officer had jurisdiction of the particular case, and was authorized to determine it. If he transcends the limits of his authority, he necessarily ceases, in the particular case, to act as a judge, and is responsible for all consequences. But with these limitations, the principle of irresponsibility, so far as respects a civil remedy, is as old as the common law itself. The authorities on this subject are almost innumerable." Here follows a list of authorities, which I do not think necessary to insert.

In the case of *Wilson* v. *Mayor*, &c., of New York, Beardsley, J., in delivering the opinion of the court, says : "And, although the officer may not, in strictness, be a judge, still, if his powers are discretionary, to be exerted or withheld, according to his own view of what is necessary and proper, they are in their nature judicial, and he is exempt from all responsibility by action, for the motives which influence him, and the manner in which such duties are performed. If corrupt, he may be impeached or indicted, but the law will not tolerate an action to redress the individual wrong, which may have been done." 1 Denio, 599.

I do not think it necessary to cite further authorities to support the general proposition I laid down, viz : That where a ministerial officer does an act as a judge, or does a judicial act, which is within his power and jurisdiction, then, although an injury may arise to another, yet such officer is not liable to a civil action by the injured party, unless it be proved that the act was wilful and malicious. The cases from Denio go fur-

ther, and exempt such officer thus acting from all liability to civil action, however malicious or corrupt his motives. Without agreeing to or dissenting from the views of the court in the two cases last cited, the authority of the highest courts in England and our country, will bear out the proposition, that the ministerial officer, acting judicially within his jurisdiction, is not liable, unless his acts be wilful and malicious. Now apply these principles to the case before us, and the judgment of the court below cannot stand.

I will, on purpose, forbear to comment on the evidence produced by the parties—will say nothing about the promptings and suggestions of the former surveyor general, nor of the letters and correspondence of the defendant. In looking over such a mass of testimony, it may be an easy matter to find exceptions to the admissibility of parts of it, which might well have been sustained. Nor will I notice the great number of instructions which the defendant asked for, and which the court refused to give. Those instructions calling on the court to tell the jury that they must find for the defendant, unless they, from the evidence, believed that he acted wilfully and maliciously in this transaction, ought to have been given. His liability alone depends on the malice and wilfulness of his acts in suspending, then annulling the contract, and in refusing to receive and approve the field notes and the work. If, from the whole transaction, taking into consideration the time of the making of the agreement, the affidavits, security to bond—the information received by defendant from the clerk in the department—the defendant's letters to the commissioner of the general land office—upon viewing the whole transaction, situation of the parties at the time, the jury should believe that Conway acted from his own judgment and conviction of what was right and proper to be done by him in the premises, to best promote the public good and the public interest, then they will find for him. But if, on the contrary, they believe he acted from *malice* or ill-will, or from a determination to oppress and harrass

the plaintiff, and to do him unjustly an injury, then they will find for the plaintiff.

The instructions for the plaintiff, about the malice and spite of the defendant being a ground to award a further sum to compensate for any vexation, are all wrong — the malice of the defendant, if there be any, being alone the ground upon which the action can be maintained. Now all the instructions refused, and all given, which are repugnant to and incompatible with the views of the court in this opinion, are improper and should not have been given.

We have said nothing about the survey of land in Iowa, not deeming that a question of much weight in this case.

The motives which induced the act of the defendant, in annulling the contract, in refusing to accept or receive or approve the work, are brought before the jury ; and if, from all the facts and circumstances attending the whole affair, they shall believe that Conway was actuated, not by malice or spite or wilfulness, to injure, harrass or oppress the plaintiff ; but was acting from his own judgment and conviction, in what seemed to him to be best for the public good and public interest, although in such act he might be mistaken, yet he is not liable to the plaintiff under such circumstances. On the other hand, he *is* liable, if his conduct was contrary to his own judgment of what was right and proper, and was the offspring of spite or malicious feeling against the plaintiff.

The judgment of the Circuit Court must be reversed and the cause remanded, Judge Scott concurring ; Judge Gamble not sitting.