**NEBRASKA DEPARTMENT OF ROADS
EMPLOYEES ASSOCIATION, an unin-
corporated association, and Richard
Kiernan, Plaintiffs,**

v.

**DEPARTMENT OF ROADS, STATE OF
NEBRASKA, and Thomas D. Doyle,
State Engineer and Director of the De-
partment of Roads, Defendants.**

No. CV72–L–183.

United States District Court,
D. Nebraska.

Aug. 8, 1973.

Douglas Marti, Lincoln, Neb., for plaintiffs.

James J. Duggan, Asst. Atty. Gen., for defendants.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

Richard Kiernan seeks relief from the effects of his discharge from public employment in the Department of Roads of the State of Nebraska. The claim is that his discharge was for one or more reasons which the United States Constitution forbids the state to use. As explained in this memorandum, this court concludes that he is right in this claim and that he therefore is entitled to relief.

The action is founded upon the Civil Rights Act, 42 U.S.C. § 1983, and jurisdiction rests upon 28 U.S.C. § 1343.

### I.

### FREEDOM OF ASSOCIATION

Following his discharge, Kiernan filed suit in the Court of Industrial Relations of the State of Nebraska and that court, after a full evidentiary hearing, concluded that it had no jurisdiction because the dismissal was not "because of . . . [Kiernan's] membership in or affiliation with the . . . [Nebraska Department of Roads Employees Association]" and therefore that there was no industrial dispute. The court said that "the plaintiffs here have not convinced us as triers of the fact that the firing of Kiernan or the other activities of the defendant as shown by the evidence were motivated by anti-union sentiment." On appeal to the Supreme Court of Nebraska the dismissal of the Court of Industrial Relations of Nebraska was upheld, again on jurisdictional grounds, because of the lower court's finding that there was no antiunion animus shown to have prompted the firing.

■■ Because the court of industrial relations had jurisdiction only to decide its own jurisdiction, I must give full faith and credit to its decision, as affirmed by the Supreme Court of Nebraska. As a finding of fact that the

termination of Kiernan's employment was not the result of antiunion behavior was necessary to a determination of lack of jurisdiction in the court of industrial relations, that fact is finally determined. However, to avoid any undue concern or needless effort, I find from a review of the evidence as a matter of fact that the discharge was not for any reasons related to Kiernan's union membership or activity.

It follows that the plaintiff Nebraska Department of Roads Employees Association is not entitled to relief. It also follows that the claim of the plaintiff Kiernan that his discharge was in violation of his constitutionally protected right of association must fail.

## II.

### FREEDOM OF SPEECH

*A. Findings of Fact.*

The defendant Thomas D. Doyle, State Engineer and Director of the Department of Roads, was appointed to that position by the Honorable J. J. Exon, Governor of the State of Nebraska, at some date not specifically disclosed by the record, but impliedly a few months before August, 1971. On August 28, 1971, at a closed meeting of the Professional Engineers in Government Section of the Professional Engineers of Nebraska, at which no representatives of the press were invited or attended, a discussion was had of the proper role of the Professional Engineers in Government Section in future political appointments. Another Department of Roads employee asked what the Section intended to do about the State Engineer's situation. The chairman of the meeting, W. R. Meyer, Jr., said that he did not know whether the board of directors of the Section had taken any stand on it at the time of the appointment but that he felt the matter could better have been considered at the time of the appointment than at this late date. Kiernan then said that he agreed that it was now too late and further said in effect that Doyle was not particularly qualified for the position of State Engineer, not being a civil engineer, and that it was inappropriate for the Governor to have appointed him to that position. Kiernan made no further comment regarding Doyle.

Doyle learned that comments of some kind regarding his qualifications had been made at the meeting but did not know that Kiernan had made them. On September 1, 1971, Doyle called W. R. Meyer, Jr. to his office and asked whether Kiernan had questioned Doyle's qualifications. An affirmative reply was received. Doyle thereafter on the same day called Donald Swing, Kiernan's immediate superior, and asked him to come with Kiernan and Deputy State Engineer Roy Gardner to his office. As stated by the Supreme Court of Nebraska:

". . . At the meeting, Doyle asked Kiernan if he had made the remarks in question and asked him if he would care to repeat or elaborate on such remarks. In answer to this question, Kiernan said, 'I'll be honest, it is my contention that you're not qualified to fill the position of Director-State Engineer, and it is my further contention that it was inappropriate for Governor Exon to have appointed you to that position.' Kiernan made it clear that the opinion was based upon the fact that Doyle was not a civil engineer, and did not have the necessary education or experience to fill the job. No voices were raised during the discussion and there was nothing threatening or otherwise objectionable about Kiernan's demeanor."

Doyle immediately informed Kiernan orally that Kiernan was suspended from his job without pay and confirmed the suspension by letter. By letter dated September 7, Doyle wrote Kiernan that, effective immediately, he was dismissed from employment. Reasons cited were "direct insubordination," "conduct unbecoming a State employee," and "for the good of the classified service," but testi-

mony makes it clear that the basis of the discharge was the substance of the words said by Kiernan in Doyle's office, as recounted above.

Doyle thought that Kiernan's opinion of Doyle's qualifications would interfere with Kiernan's ability to perform his duties. Doyle neither knew of nor investigated Kiernan's work performance before the suspension or between the suspension and the discharge. No evidence suggests that Kiernan's ability to perform his work was affected in fact by his opinion of Doyle's qualifications or Kiernan's expression of that opinion. Work performance records of the Department of Roads showed Kiernan to be average or above in his day-to-day performance.

Although the full organizational structure of the Department of Roads' 2,600 employees is not revealed in the evidence, it is beyond doubt that Kiernan was several layers below Doyle in that structure and that they did not have frequent or regular contact. Indeed, Doyle knew Kiernan, as far as the record shows, only through and with respect to Kiernan's union activities, until the time of the September 1, 1971, meeting in Doyle's office.

These are the facts upon which the propriety of the discharge must be judged.

### B. *Application of the Facts to the Law.*

 Generally, a government may deny an employee the benefits of employment for many reasons, perhaps in some instances for no reason. Nevertheless, there are some reasons it cannot properly use. It must not "deny a benefit . . . on a basis that infringes his constitutionally protected interests —especially, his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570

(1972). The reason is easy to see: The First and Fourteenth Amendments to the Constitution forbid a state's "abridging the freedom of speech," and if the state could discharge an employee for speaking, he would not be free to speak. The freedom, however, is not absolute and the task is to arrive at a balance between the interests of the employee, "as a citizen, in commenting on matters of public service and the interest of the State, as an employer, in promoting efficiency of the public services it performs through its employees." [1]

More specifically, the discharge of Kiernan must be tested by the decision of the Supreme Court of the United States in Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In that case a teacher had been dismissed for sending a letter to a local newspaper in connection with a recently proposed tax increase. The letter was "critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenues for the schools." [2] The letter also "charged the superintendent of schools with attempting to prevent teachers in the district from opposing or citicizing the proposed bond issue." [3] Some of the statements in the letter were true, some false. The court held that writing of the letter could not be used properly as a basis for discharging the teacher. As to the statements in the letter which were true, but critical, the court said:

"... The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser

1. Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

2. Ibid., 564, 88 S.Ct. 1733.

3. Ibid., 566, 88 S.Ct. 1734.

extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct . . . may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it." [4]

As to the false statements in the letter, the court held that:

". . . absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. Since no such showing has been made . . ., his dismissal . . . cannot be upheld . . ." [5]

■ Whether the statements of Kiernan be viewed as true or false, they do not meet the criteria set out in *Pickering* for justifiable discharge. The statements were almost purely opinion; to the extent that they were factual in nature—that Doyle was not a civil engineer and that the Governor appointed Doyle—they were true. They dealt with matters of public concern. They did not relate to the qualifications of a person whose day-to-day relationships with Kiernan were so close as to demand such personal loyalty or confidence or harmony that the statements, even in the absence of evidence of some detrimental effect upon the Department of Roads or upon Kiernan's ability to perform his work, are to be presumed detrimental.

The defendants' statement of position is enticingly simple. They state in their brief:

"Can any one honestly believe that a smooth and harmonious operation of the Department of Roads could continue if a subordinate employee continues to express his belief that his boss is incompetent? Can he be a 'faithful' employee? Can he be a 'trusted' employee? Can he perform his duties in a conscientious manner . . .?

"What about the effect on other employees? . . ."

The answers to these questions need to be found in the evidence in order to constitute justification for the state's interference with Kiernan's freedom to express his views. No evidence answers these questions. The defendants would have the answers presumed from the fact of the superior-subordinate relationship of the parties, which *Pickering* squarely declares cannot be done in the absence, at least, of a special closeness that speaks of its own need for confidentiality and loyalty. Doyle's considerable distance from Kiernan hardly was that kind of closeness. Therefore, in the absence of a factual showing that Kiernan's views or expressions of them diminished his faithfulness, trustworthiness, conscientiousness or competence, or tended in fact to produce disharmony among other employees, the dismissal must be declared improper. When the defendants in their oral argument and brief asked hypothetically what would happen if a judge's law clerk said that he regarded the judge unqualified, they missed the distinction drawn in *Pickering* between close and distant relationships, although I express no opinion as to a proper disposition of a dismissal of a law clerk under these circumstances.

■ Characterizing Kiernan's words as "insubordination" or "conduct unbecoming a State employee" or contrary to "the good of the classified service" is not helpful to the defendants. The latter two items are too vague to be analytically useful, and the first does not fit. "Insubordination" means "in an insubordinate manner" and "insubordinate" in this context means "unwilling to submit to authority; disobedience . . . Insubordinate applies to disobedience of orders, infraction of rules, or a general-

---

4. Ibid., 569, 570, 88 S.Ct. 1735.

5. Ibid., 574, 88 S.Ct. 1738.

ly disaffected attitude toward authority . . . ."[6] Illustrative of insubordination is the case of Ahern v. Board of Education of School District of Grand Island, 456 F.2d 399 (C.A. 8th Cir. 1972), where a discharge was upheld for a teacher's refusal to obey orders of the school superintendent to teach economics, rather than politics, in an economics class. On the other hand, no evidence of disobedience by Kiernan of any order or directive by Doyle or any other superior is present. Thinking and saying that a superior is not qualified to hold his position and that his appointment was inappropriate, without more is not insubordination which is beyond the scope of the First and Fourteenth Amendments' protection. More than imaginings of disobedience is necessary. Evidence of actual disobedience is necessary for insubordination, at least where the working relationships are as they were in this case.

### C. Relief.

▮ In view of City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), holding that a city is not a "person" under the Civil Rights Act, 42 U.S.C. § 1983, and therefore is subject neither to damages nor to equitable strictures, the Department of Roads, a subdivision of the State of Nebraska, similarly is free of the Civil Rights Act. The considerations relating to a city appear to be equally persuasive for a department of a state government.

▮ The defendant Doyle, however, under the Act, is subject to injunctive relief and may be liable in damages. The plaintiff Kiernan has lost salary at the rate of $855.00 per month since September 29, 1972. Between September 1, 1971, when he was discharged from state employment, and September 29, 1972, he was employed by the Nebraska Department of Roads Employees Association

and lost no salary during that time. His total salary loss, therefore, is $8,840.00 to August 8, 1973.

Literal reading of the Civil Rights Act, 42 U.S.C. § 1983, would result in an assessment of money damages. The Act declares that "Every person who . . . subjects . . . any citizen . . . to the deprivation of . . . rights . . . secured by the Constitution . . . shall be liable to the party injured . . . ." But the Supreme Court of the United States has foreclosed a literal reading. In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) and Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), full immunity from liability for monetary damages was approved for legislators and judges and limited immunity for police officers upon the principle that Congress in enacting the Civil Rights Act did not intend to eliminate immunities that were extant at common law.

▮ The crucial question here is whether high administrative officials of state government had immunity from liability at common law. The weight of authority is that there was such immunity[7], but there is no unanimity as to the nature of the immunity. A number of early cases held that an administrative officer was fully immune from tort liability assertedly arising from the exercise of quasi-legislative or quasi-judicial functions. Stewart v. Case, 53 Minn. 62, 54 N.W. 938 (1893), citing Harrington v. Commissioners, 2 McCord, S.C., 400; Freeman v. Cornwall, 10 Johns., N.Y., 470; Sage v. Laurain, 19 Mich. 137; Van Steenbergh v. Bigelow, 3 Wend., N. Y., 42; Burton v. Fulton, 49 Pa. 151; Harman v. Tappenden, 1 East, 555; Wall v. Trumbull, 16 Mich. 228. There is also a body of case law holding that an administrative officer has a qualified immunity from tort liability such that he is immune absent proof that he acted

---

6. *Webster's Third New International Dictionary,* 1969.

7. Davis, "Administrative Officers' Tort Liability," 55 Mich.L.Rev. 201, 230 (1956); Note, "The Proper Scope of the Civil Rights Acts," 66 Harv.L.Rev. 1285 (1953).

with malice. Sailling v. Morrell, 97 Neb. 454, 150 N.W. 195 (1914); Reed v. Conway, 20 Mo. 22; cf. State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893). *Reed* is particularly enlightening:

"From a careful examination of authorities from the case of Turner v. Sterling, 23 Car. II, reported in 2 Ventris, 26, down to our own times, both in English and American courts, the doctrine that a ministerial officer, acting in a matter before him with discretionary power, or acting in a matter before him judicially, or as a quasi judge, is not responsible to any one receiving an injury from such act, unless the officer act maliciously and willfully wrong, is most clearly established and maintained."

20 Mo. at 43

The article by Professor Davis, cited in fn. 7, finds this latter position supported by the weight of authority. In accord with Professor Davis is the law review comment titled, "The Evolution of the State of Mind Requirement of Section 1983," Tulane L.Rev. 870 (1973).

▄▄ There is also a split of authority concerning which party bears the burden of pleading and proof on the issue of good faith. Some courts have held that an assertion of lack of good faith is a necessary element of the plaintiff's cause of action and thus that the plaintiff must both plead lack of good faith and bear the burden of proof on the issue. Walker v. Bank of America, 268 F. 2d 16 (C.A. 9th Cir. 1959). Other courts have held that immunity is a matter of affirmative defense and thus the defendant bears the burden of raising the issue and proving good faith. McLaughlin v. Tilendis, 398 F.2d 287 (C.A. 7th Cir. 1968). Neither of the cited cases and none of the law review articles that this court has consulted specifically deals with the question of who bore the burden of pleading and proof at common law. This was the standard used by the Supreme Court in Pierson v. Ray, supra. There

the court held that good faith was a defense that the police officers could raise to a claim of false arrest. This holding was based on the common law that good faith and probable cause is a defense to an action for false arrest. The state of the common law on who bears the burden of pleading and proof regarding good faith of administrative officers is not altogether clear. However, there is some fair certainty regarding the law in the State of Nebraska. Sailling v. Morrell, supra, indicates that the burden of pleading and proof is on the plaintiff. Since in Pierson v. Ray, supra, the United States Supreme Court noted with approval the Fifth Circuit's reliance upon the common law of the state where the official action occurred, it is reasonable and proper for this court to rely here upon the common law of the State of Nebraska as to the burden of proof, although the matter of pleading remains under federal law.

Moreover, this court is bound by Strickland v. Inlow, 485 F.2d 186 (C.A. 8th Cir. 1973). This case concerned the dismissal from school of two girls for spiking the punch at a school function. The court held that they had been dismissed without substantive due process. In ordering a new trial on the issue of damages the court dealt with the question of immunity for school board members. It held that the plaintiffs need not prove, in order to recover damages, that the defendants acted specifically with malice toward the plaintiffs. "It need only be established that the defendants did not, in the light of all the circumstances, act in good faith. The test is an objective, rather than a subjective, one." The implication is that the burden of proof is upon the plaintiff. Since the common law immunity of school board members is subsumed under the broad category of immunity for administrative officers, this case sets the governing standard. The only possible discrepancy between the holding of *Strickland* and the analysis this court has developed is that it is arguable that at common law the plaintiff had

to plead and prove that the defendant acted with malice toward him and that it was the defendant's subjective state of mind that was determinative of the issue. Sailling v. Morrell, supra, casts no light on this problem. However, the later case of Allen v. Miller, 142 Neb. 469, 6 N.W. 2d 594 (1942), indicates no requirement that there be specific malice toward the plaintiff or that the defendant's subjective state of mind is determinative. Thus the common law of Nebraska is consistent with the standard set down in *Strickland*. Hence, *Strickland* may safely be followed in deciding this case.

Pleading the matter of lack of good faith is not necessary under federal pleading standards. The complaint gave adequate notice of the factual setting of the claim, and nothing more was required.

Careful review of the evidence leads me to conclude that the plaintiff has not carried his burden of proving that the defendant Doyle did not act in good faith, measured by an objective standard. Doyle thought he had an unlimited right to fire Kiernan, and he thought that Kiernan was insubordinate. He was mistaken in both instances, but he did not act in bad faith. Article IV, Section 1, of the Constitution of the State of Nebraska, and § 81–101 of the Nebraska Revised Statutes ostensibly gave him authority to do what he did. In the absence of prior court rulings illustrating the limitations by the federal Constitution on his authority, Doyle cannot be said to have been in bad faith in relying upon that state law. Necessarily, the result is that no judgment for damages should be entered against Doyle.

This outcome does not mean, as the plaintiff Kiernan argues, that Doyle with impunity may discharge Kiernan again and again for the exercise of constitutional rights and cause Kiernan to go unendingly without salary while plodding through the courts. Immunity from liability for damages rests on good faith. When and if future firings happen, the question of good faith must be deter-

mined from the entire panoply of facts then bearing on that issue, including the outcome of the present case.

A judgment directing reinstatement of Richard Kiernan will be entered, but no damages are assessed.