**Mary GILBERTSON**
v.
**Scott McALISTER et al.**
Civ. No. H-74-19.

United States District Court,
D. Connecticut.
Nov. 4, 1975.

Bruce C. Mayor, Hartford, Conn., for plaintiff.

Albert G. Murphy, Hartford, Conn., for defendant members of Hartford Board of Education.

Ralph C. Dixon, Day, Berry & Howard, Hartford, Conn., for defendants McAlister, Fox, Sanchez, Buckley, Kenny, Rubera and Martin (in their individual capacities).

Joseph W. Lemega, Thomas J. Hagarty, Halloran, Sage, Phelon and Hagarty, Hartford, Conn., for defendants Kelly and Macy.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

In this civil rights action, the plaintiff, Mary Gilbertson, a former tenured English teacher at Weaver High School in Hartford, seeks injunctive relief, reinstatement, back pay and damages against the defendants who include most of the elected members of the Hartford Board of Education, the Superintendent of Schools, and the Chairman of the Hartford Court of Common Council. Jurisdiction of this Court is premised upon 28 U.S.C. § 1343 for the two causes of action which are set forth in the complaint pursuant to the provisions of 42 U.S.C. § 1983.

In the first count of her lengthy complaint, Ms. Gilbertson contends that the defendants, acting in their official capacities, wrongfully discharged her as a teacher in violation of her rights under the First and Fourteenth Amendments. The second count charges that the individual defendants acted maliciously and with deliberate intent to deprive the plaintiff of her constitutional rights to freedom of speech, due process of law, and equal protection of laws. On October 17, 1974, this Court denied the plaintiff's motion for partial summary judgment. Thereafter a court trial was held at which 19 witnesses testified; in addition, comprehensive trial briefs have been filed by the parties.

### I.

The record discloses that, for some time prior to November, 1973, the Hartford community, the Court of Common Council of Hartford (the City of Hartford's governing body), and education officials of the City were deeply concerned over the unrest and potentially explosive situation that existed at Weaver High School, a school located in the west end of the City consisting of predominately black students. The atmosphere at the school was continually punctuated by disruptive behavior by the students, false fire alarms, fist fights, extreme truancy, interracial disturbances, and confrontations among students, teachers and administrators. Officials further became disturbed and alarmed when on divers days in October certain leaflets, prepared by an organization called the Revolutionary Youth Movement, were distributed to students and teachers at Weaver High School. These materials denounced several employees in the Hartford educational system and criticized the Work Study Program, a school project which enabled students to work at part-time jobs during school hours.

It was clearly established at trial that Ms. Gilbertson participated in the circulation of these leaflets at the school; indeed, in her complaint, par. 4, she admits that during the month of October, she and other individuals "distributed in the immediate vicinity of Weaver High School, leaflets, prepared by others of a partisan nature." In addition, she concedes that "she placed copies of a press release issued by the United States Labor Pary (sic) on a table in the faculty lounge" of the school and that these materials were "sharply critical of certain school programs and employees of the defendants."

One leaflet focused on the principal of Weaver High School, Stewart Street, stating, among other things, that Mr. Street 1) imposed a "CIA-style reign of terror" at the school, where "cop cars ring the school, bluecoats invade the halls and cafaterias (sic) on the slightest pretext, and over 100 students have been illegally suspended or expelled;" 2) established a "terrified student body, easily regimented for slave labor;" 3) refused to reinstate an expelled militant student "even after a court ordered him to do so;" and 4) used "military riot-control gas" against demonstrating students when he was principal of a school in Camden, New Jersey, in 1972. (Ex. 5).

It is uncontroverted that these allegations against Mr. Street were false and made with a reckless disregard for the truth in all respects.

Another leaflet urged the students to "smash" the "work-study program" which, according to the article, was a plan of the "millionaire insurance executives and bankers of this city" to destroy the Hartford public schools and to force students into "slave-labor" jobs. (Ex. 8). An additional leaflet urged Weaver students to "organize their teachers on behalf of the Mary Gilbertson campaign for Weaver school representative of the Hartford Federation of Teachers." (Ex. 6).

On October 22, 1973, the Hartford Court of Common Council, noting its displeasure with the dissemination of certain literature to students at Weaver High School by "left wing activists groups" and "a teacher" at the school (presumably the plaintiff), passed a resolution calling for "an immediate investigation of the situation at Weaver High School which will include determining the causes of current unrest; who is fomenting current unrest; what legal sanctions may be instituted against those responsible, including any Board of Education employees who may be involved." (Ex. 3, p. 2316).

Upon learning of the resolution passed by the Council, Superintendent of Schools, defendant Kelly, telephoned defendant Martin, the chairman of the Council, and informed him that the resolution was "out of order" and was an "interference" with his work as Superintendent. However, Mr. Kelly did decide to order an investigation into the trouble at Weaver and instructed Principal Street and defendant Macy to look into the matter.

As a consequence, Mr. Street requested that Ms. Gilbertson report to his office on October 23, 1973. Ms. Gilbertson stated that she would appear only if a witness were permitted to accompany her. Thereupon Mr. Street ordered her to attend the meeting with him, stating that, after they had an initial conference, he would allow her to call in a witness. When she again refused to come to his office, Mr. Street informed her that he considered her refusal to be an act of insubordination. Despite this warning, Ms. Gilbertson failed to appear at Mr. Street's office.

On November 2, 1973, defendant Kelly suspended Ms. Gilbertson without pay and discharged her from employment effective February 4, 1974. In effect, she was terminated as a teacher for "misconduct." Specifically, the Superintendent's notice enumerated six reasons for the action which may be summarized as follows:

1. Failing to obey two lawful orders of the principal of Weaver High School;

2. Participating in the distribution of literature prepared by a "political, partisan and controversial" organization (the Revolutionary Youth Movement), in violation of a rule of the Board of Education;

3. Circulating false and inflammatory materials concerning the principal of Weaver High School;

4. Using students to promote a partisan interest;

5. Distributing leaflets which contained untrue accusations against city officials;

6. Failing to heed prior warnings from the Superintendent "not to allow your private beliefs to interfere with your responsibilities of adhering to stated Board policy."

Pursuant to the Teachers' Tenure Act, Hartford City Charter, App. 8 § 9, Ms. Gilbertson appealed the Superintendent's decision to the Hartford Board of Education. Full evidentiary hearings were conducted over a period of four days at which the plaintiff was represented by counsel, numerous witnesses were called and extensively cross-examined, and several exhibits were introduced. This Court has carefully reviewed the 1,000-page transcript of the proceedings before the Board.

On January 4, 1974, the Board upheld the plaintiff's dismissal by a vote of six to two on the ground that the Superin-

tendent's charge of "misconduct" (one of the three grounds in the City Charter, Appendix 8, Section 8 under which a teacher may be dismissed) was proved. This action followed. At trial, six members of the Board testified that in their opinion Ms. Gilbertson was guilty of Charges I, II, and III; in addition, four of these six members believed one or more of the remaining charges had been proven to their satisfaction.

## II.

The plaintiff first contends that the charges against her were too trivial and insubstantial to warrant her dismissal from employment. She argues that "(e)ven if it is considered insubordination to refuse to go to the principal's office . . . and even if it is a violation of school policy to hand out three leaflets in the faculty parking lot . . . and even if by giving them out it is tantamount to unprofessional conduct," she could not be discharged for "misconduct." However, as will be discussed, infra, it is the opinion of the Court that the proven charges against the plaintiff, either individually or collectively, were sufficient to justify the plaintiff's termination as a teacher. Moreover, the plaintiff's reliance on *Fisher v. Snyder,* 476 F.2d 375 (8 Cir. 1973) and *Johnson v. Branch,* 364 F.2d 177 (4 Cir. 1966) (en banc), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), is misplaced.

In *Fisher,* the plaintiff, a middle-aged divorcee, was dismissed by the school board for "conduct unbecoming a teacher" because she allowed men on several occasions to stay in her apartment overnight. The district court ordered reinstatement and the decision was affirmed on appeal. Both courts concluded that there was "no proof of improper conduct" but, at most, the evidence only raised a question of Mrs. Fisher's good judgment "in her personal affairs." 476 F.2d at 378. In *Johnson,* the Court of Appeals found that the plaintiff's dis-

charge was race-inspired and that the school board acted arbitrarily and capriciously in dismissing her for minor and trivial infractions of the rules, such as being 15 minutes late to supervise an athletic contest and her failure to give a written explanation for not attending a P.T.A. meeting. 364 F.2d 178. However, in the instant case, there is no claim of racial discrimination; Ms. Gilbertson's severance from the Hartford school system was based on serious and legitimate considerations concerning her conduct as a teacher. Cf. *Gorham v. Jewett,* 392 F.Supp. 22 (D. Mass.1975).

## III.

The second argument advanced by the plaintiff is that she was denied substantive due process because four of the reasons for her dismissal (Charges I, IV, V and VI) were not supported by substantial evidence at the administrative hearing. Cf. *Lucas v. Chapman,* 430 F.2d 945, 948 (5 Cir. 1970). Since it was not clear at trial that a majority of the Board found Charges IV, V and VI sufficient to discharge the plaintiff, those grounds need no further discussion herein.

Charge I accused the plaintiff of insubordination to Mr. Street, Principal of Weaver High School. "Insubordination" in the context of this case means "disobedience" and an unwillingness to submit to authority. See *Nebraska Dept. of Roads Emp. A. v. Department of Roads,* 364 F.Supp. 251, 255 (D.Neb. 1973). A review of the evidence adduced before the Board, see *Simard v. Board of Education of Town of Groton,* 473 F.2d 988, 995 (2 Cir. 1973), clearly supports the decision of a majority of the Board that Ms. Gilbertson was guilty of insubordination when, on two occasions, she refused to comply with a lawful order of Principal Street to report to his office. Indeed, the plaintiff does not deny she wilfully failed to obey his orders, but merely attempts to explain them away

**6**

as reasonable under the circumstances. Obviously, her explanations were not acceptable to six members of the Board. It is not the function of this Court to second-guess the judgment of school officials, nor may the court reinstate the plaintiff as teacher because the Board exercised its discretion with a minimum of wisdom. As the Supreme Court recently noted in *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L. Ed.2d 214 (1975), a students' rights case:

> The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

See also *Cato v. Collins,* 394 F.Supp. 629, 640 (E.D.Ark.1975); *Robbins v. Board of Education,* 313 F.Supp. 642 (N.D.Ill.1970).

## IV.

The plaintiff's next claim involves important First Amendment rights. Charge III accuses Ms. Gilbertson of "distributing materials which contain false and inflammatory accusations not only against your school principal, Stewart Street, but also regarding the school program." While Ms. Gilbertson concedes that "she performed most of the acts" referred to in Charge III (Plaintiff's Trial Brief, p. 13), she contends that the acts complained of were constitutionally protected. See, e. g., *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *James v. Board of Education of Central Dist. No. 1, Etc.,* 461 F.2d 566 (2 Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972).

■ It is now well established that teachers do not shed their constitutional rights to freedom of speech and expression at the schoolhouse door. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Teachers may not be constitutionally compelled to relinquish their First Amendment right to comment on matters of public interest in connection with the operation of the public schools in which they work. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1967). On the other hand, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* In balancing these competing interests, several guidelines advanced in *Pickering* and other leading cases are applicable to this case. Among other factors, the Court must consider 1) whether a question of harmony, personal loyalty and confidence among coworkers is involved; 2) the degree of falsity of the statements; 3) the place where the speech or distribution of the leaflets occurred; 4) the impact of the statements upon the staff, faculty and students; and 5) whether the Board members acted in retaliation for the plaintiff's exercise of protected rights or whether they were solely influenced by the plaintiff's conduct as a teacher. See, e. g., *Fuentes v. Roher,* 519 F.2d 379, 390, n. 6 (2 Cir. 1975); *Adams v. Campbell Cty. Sch. Dist.,* 511 F.2d 1242, 1246 (10 Cir. 1975); *Stolberg v. Members of Board of Trustees,* 474 F.2d 485, 488 (2 Cir. 1973); *Simard v. Board of Education,* supra, 473 F.2d at 995–996; *Johnson v. Branch,* 364 F.2d at 182.

■ Applying these general principles to the facts in the case at bar, the Court is of the firm opinion that the Board's decision to terminate Ms. Gilbertson's employment was wholly justified and not impermissibly premised upon the exercise of her rights to free speech and expression.

There is little question that the leaflets distributed by Ms. Gilbertson at Weaver High School contained some of the most serious, appalling and damaging accusations that could be leveled against a principal of a school by a coworker. It seems clear that the main purpose behind the attack upon Mr. Street's character and competence as an administrator was to foment conflict and dissension among students, teachers, and their principal at a time when student and teacher morale was crucial to the efficient operation of the high school. The impact of the carelessly made false statements on the day-to-day operation of the school was immediate and harmful, and served to exacerbate the already tense and divisive situation that existed at the school.

As a result, Mr. Street and the "major part" of his administrative staff spent a "good deal of time" convincing gatherings of students that the statements were untrue. (Tr. pp. 103–104). While Ms. Gilbertson did not compose the contents of the leaflet, she did cause its dissemination and, when questioned by another teacher as to the reliability of the information, Ms. Gilbertson replied, "It's awful, but it's true." Further, it is appropriate to note that Ms. Gilbertson herself recognized the enormity of her wrongdoing. When she learned that the leaflet contained fabrications, she convened a "public meeting" and appeared on television to make "it very clear to community people that that part of the leaflet, to the best of my knowledge, was inaccurate." (Tr. p. 474).

Moreover, at trial the Court heard the testimony of all the members of the Board and had an adequate opportunity to observe and judge their credibility. In the Court's opinion there was not a shred of credible evidence to support the plaintiff's theory of retaliatory motivation. Cf. *Simard v. Board of Education,* supra, at 995. Of particular significance is the fact that the testimony of the two dissenters neither indicated nor even insinuated that the other members of the Board reached their decision on any factors other than the plaintiff's actions as specified in the charges against her.

Under these circumstances the manifest weight of the evidence fails to support the plaintiff's contention that her dismissal was constitutionally proscribed.

### V.

The plaintiff's fourth argument focuses on Charge II which accuses Ms. Gilbertson with participating in the distribution of flyers to staff and students in violation of Board of Education policy, Administrative Manual § 2080–1, which reads in pertinent part that "neither the facilities, the personnel, nor the students may be employed in any manner for advertising, distribution of advertising materials or otherwise promoting the interests of any commercial or other nonschool agency or organization of a political, partisan, controversial, or sectarian nature."

The plaintiff asserts that this regulation is unconstitutionally overbroad and, as applied to her conduct, constituted a denial of the equal protection of the laws. The claims are without merit. The regulation is but a part of a three-page administrative document entitled "Drives, Selling, and Advertising" designed to keep students free of commercial and other extraneous influences that could detract from the primary purposes of education. Nothing in these rules appear to be *per se* unreasonable and it is evident that they were promulgated as a valid code of conduct for the school system. Cf. *Sullivan v. Houston Independent School District,* 475 F.2d 1071, 1076 (5 Cir. 1973). Moreover, the examples cited by the plaintiff to support her claim that other teachers in the same school system were not punished for allegedly similar violations of the regulation in question are readily distinguishable. None involved the flagrant violation of the school regulation as in Ms. Gilbertson's case. Cf. *Robbins v. Board of Education,* supra;

*Schwartz v. Schuker,* 298 F.Supp. 238, 242 (E.D.N.Y.1969); see Haskell, Student Expression in the Public Schools: *Tinker* Distinguished, 59 Geo.L.J. 37 (1970).

### VI.

■ The plaintiff's last contention under Count One of her complaint is that "misconduct" as a ground for the termination of a tenured teacher's employment, Hartford Teacher Tenure Act, § 8, is unconstitutionally vague and overbroad. Relying on *Burton v. Cascade School District,* 353 F.Supp. 254 (D.Or. 1973), aff'd 512 F.2d 850 (9 Cir. 1975), she argues that the term in the context of the ordinance lacks a definition or set of applicable standards, and thus it subjects a teacher to discriminatory and erratic exercises of authority by the Board of Education. The Court disagrees.

In *Burton* the court found that a teacher's admitted practice of homosexuality did not constitute "immorality" and therefore her dismissal was not justified. 512 F.2d at 854; cf. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In the instant case, the plaintiff was discharged for a wilful violation or disregard of standards of behavior which the Board had every right to expect of one of its teachers. Without a doubt Ms. Gilbertson's improper actions as a teacher constituted "misconduct." Cf. *Martino v. Administrator,* 20 Conn.Sup. 394, 398, 136 A.2d 810 (1957). Because of the wide variety of factual situations in which a teacher may be dismissed for wrongful conduct, the statute need not describe with more specificity the meaning of the term "misconduct." Cf. *Arnett v. Kennedy,* 416 U.S. 134, 161–162, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). As was stated in *Meehan v. Macy,* 129 U.S.App.D.C. 217, 392 F.2d 822, 835, (1968), modified, 138 U.S.App.D.C. 38, 425 F.2d 469, aff'd en banc, 138 U.S.App. D.C. 41, 425 F.2d 472 (1969), quoted with approval in *Arnett v. Kennedy,* supra:

> [I]t is not feasible or necessary for the [governmental employer] to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes "catchall" clauses prohibiting employee "misconduct," . . . .. We think it is inherent in the employment relationship as a matter of common sense if not common law that an employee . . . cannot reasonably assert a right to keep [her] job while at the same time [she] inveighs against [her] superiors in public with intemperate and defamatory [statements]. [Dismissal in such circumstances neither] comes as an unfair surprise [nor] is so unexpected and uncertain as to chill [her] freedom to engage in appropriate speech.

See also *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972).

### VII.

■ Count Two of the complaint raises the final issue, whether the majority members of the Board, acting individually, were impermissibly biased against the plaintiff. E. g., *Stolberg v. Members of Board of Trustees,* supra. For the reasons previously stated, the Court finds that the proof in this case does not support a contention that the Board had prejudged the plaintiff's case; rather, the evidence is sufficient to demonstrate that the Board acted in good faith and without malice. Cf. *Simard v. Board of Education,* supra, at 995–996; *Hibbs v. Board of Education,* 392 F. Supp. 1202, 1205 (N.D.Iowa 1975); *Powers v. Mancos School District,* 391 F.Supp. 322, 325–26 (D.Colo.1975).

### VIII.

Accordingly, judgment shall enter for the defendants in all respects.